[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action for a dissolution of marriage was brought to this court on November 17, 1998. It was tried to the court on February 15, 2000 and March 3, 2000.
The parties were married on May 6, 1972 in Waterbury and have resided continuously in the State of Connecticut for several years. They have two children, one of whom, Nicole, is a minor born April 16, 1985. Neither the parties nor their children have received financial support from the State of Connecticut or from any municipality. The court has jurisdiction to hear this matter.
At the time of the hearing the plaintiff-husband was 50 years of age, the defendant-wife, 49. Both parties reported past health problems. The plaintiff was hospitalized for migraine headaches several years ago, and most recently in 1998 for stress. The wife was diagnosed with epilepsy in high school but had no attacks in the prior ten years. She has taken medication to control it since her son, now 23, was six months old. More significantly, as a result of a birth defect she has nerve damage which limits the use of her right arm. This condition underlies her claim that she CT Page 4565 cannot drive or seek employment other than as a retail clerk. She offered no medical evidence as to the possibility of a recurrence of epilepsy nor of the nature and extent of her arm disability and whether therapy would improve the condition of her hand and arm. Based on the credible evidence the court cannot conclude that her disability is so limiting as she claims. The court finds that the parties are in reasonably good health.
The plaintiff obtained his high school diploma after briefly serving in the Marine Corps from which he received a medical discharge because of blood pressure problems. He went to a technical school at night and he learned to be a machinist.
At the time of the marriage, he was employed at Anchor Fasteners on the night shift. At his wife's request, he obtained employment during the day at American Electroplating. In 1976 when their first child was born, he began employment at Burndy Manufacturing where he worked for approximately 17 years and rose to the level of supervisor. After the company was bought by Framatone in 1993 he worked in Norwalk. In 1994 his employment was terminated. He received a severance payment and sought employment for one year. After working in various factories he obtained full-time employment at Winchester Electronics where he is now a supervisor earning $52,000 per year.
The defendant graduated from high school and attended Mattatuck Community College, studying marketing. She did not obtain a degree. While at Mattatuck, she worked part-time as a telephone solicitor. After leaving Mattatuck, she went to work at Caldor's full-time, remaining there for 6 years. Her duties included straightening shelves and placing orders for health and beauty aids. She left Caldor's a few weeks before her first child was born in August 1976. In 1978, she worked for 1 1/2 years at a health spa for 20 hours per week, performing telephone solicitation at minimum wage. Thereafter, she babysat in her home from 1980 to April 1985 for approximately 6-8 hours per day at a rate of $50 — $75 per week. She stopped babysitting when she went into labor with her daughter in April 1985. She continued babysitting after her daughter's birth and then did house cleaning for Advanced Cleaning for 2 years. She worked 20 hours per week for $50 per week. In 1992-1993 she waitressed at St. Margaret McTernan High School for 20 hours per week at a rate of $6.00 per hour. In the fall of 1993, she obtained a part-time position at K-Mart working 20 hours per week as a sales clerk. She has remained an employee of K-Mart. After several attempts at CT Page 4566 obtaining full-time employment there she succeeded and now manages the jewelry department. She earns $326 per week and has qualified for medical coverage. She has not sought other employment because she does not drive. K-Mart is close to her home and her mother or son generally provide transportation for her.
The parties purchased their first home in 1979 having received financial help from the defendants' parents. They moved to a larger home in 1988. The husband improved the home by finishing the family room, installing sheetrock, building a deck and adding an above-ground swimming pool. Today its estimated value is $120,000. The balance remaining on the first mortgage is $6000 and the balance on the home equity line of credit is $13,000. The equity, therefore, is approximately $101,000.
The plaintiff was dissatisfied with the marriage for several years before the separation. It would serve no purpose to recount the plaintiff's complaints regarding the defendant's housekeeping skills or her more relaxed attitude regarding the children's discipline. The defendant paid little attention to these. More significantly, the plaintiff, who has worked hard throughout the marriage, was frustrated that his wife failed to improve herself so as to obtain better paying employment. He was concerned about financial security and wanted her to earn more to pay for their daughter's parochial school. Her response to him was "don't worry." The defendant's inability to drive hampered her ability to seek other employment. She did not see the need to drive since her husband and mother drove her where she needed to go. She did not seek any further medical opinion on her nerve disability to determine whether or not she could strengthen her arm. In 1998 she took driving lessons but became "nervous" and encountered problems with her arm. She still does not have a license. Her work experience belied some of the plaintiff's criticism, however. She worked throughout most of the marriage balancing child rearing with her part-time, low-paying jobs. In addition, she incurred no child care expenses when she worked. The plaintiff often cared for the children after he returned from work in the late afternoon. Therefore, her income was not reduced by such expenses.
The plaintiff's dissatisfaction came to a head in 1998. He purchased a home computer and began communicating on the Internet with one Ms. D'Angelo. He also went out for long drives in the evening. When he was hospitalized for stress, his wife was CT Page 4567 unsympathetic. During the summer of 1998 he cashed in his IRA, valued in excess of $35,000, without the defendant's knowledge. He provided no accounting of how much of the money was spent except to state that he had spent it on himself. The court finds the defendant did not receive one-half of it or approximately, $17,500. In addition, the parties took out the home equity loan to pay credit card debt.
On October 4 he told the defendant that he wanted a divorce. The next day he again told his wife in her mother's presence that he wanted a divorce. They both told him to leave the marital home. After living with his sister and then his mother, he moved into D'Angelo's residence.
The court finds that the marriage has broken down irretrievably.
The parties entered into a stipulation in partial settlement of their dispute, the terms of which follow and are ordered by the court.
 1. Dissolution: Judgment of dissolution shall enter on the grounds of irretrievable breakdown.
 2. Custody: The parties shall share joint legal custody of their daughter Nicole. The defendant mother shall have residential custody. The plaintiff father shall have liberal, flexible and reasonable rights of visitation.
 3. Child Support: The plaintiff father shall pay the sum of $150 per week as child support by immediate wage execution until the minor child attains the age of 19 years or graduates from high school, whichever event first occurs. This amount is in accordance with the child support guidelines.
 4. Medical Insurance: The plaintiff shall provide medical insurance for the minor child. The child's unreimbursed medical expenses shall be shared by the parties in accordance with the child support guidelines: 59% by the plaintiff and 41% by the defendant after she pays the first $100 of unreimbursed expenses.
 5. Real Property: The plaintiff shall quit claim his interest in the marital domicile to the defendant. She CT Page 4568 shall be responsible for paying the first mortgage, the home equity loan, real property taxes and homeowners insurance until she sells or refinances the mortgages and she shall hold him harmless and indemnified thereon.
6. Personal Property:
 1. The plaintiff shall retain the IRA and/or the proceeds of the portion of the IRA he liquidated. He shall pay any tax penalties which were caused by his early liquidation.
2. Each party shall retain his/her own 401K plan.
 3. The Framatone Pension Plan shall be divided equally between the parties through the use of a Qualified Domestic Relations Order. The parties shall share equally in the cost of the preparation of this document.
 4. The $300 held in escrow by Attorney Bozzuto shall be released to the parties for the specific purpose of paying Nicole's tuition at Holy Cross School.
 7. Liabilities: The plaintiff shall be responsible for the obligations to visa, Nationwide Computers and his attorney. The defendant shall pay her credit card debt and her attorney for that portion of her legal bill not paid by the husband as ordered below.
 8. 1999 Tax Returns: The parties shall file separate income tax returns for 1999.
In addition, the following orders are entered based upon the evidence presented and the court's findings:
 9. Real Property: The defendant shall sell or refinance the home terminating the plaintiff's liability on the first mortgage and the home equity loan no later than June 1, 2003.
 10. Alimony: The plaintiff is to pay the defendant the sum of $150 per week until May 31, 2004. Thereafter, he is to pay $100 per week until. May 31, 2010. Alimony shall terminate upon the death, remarriage or cohabitation of the defendant pursuant to statute. Alimony may be CT Page 4569 subject to modification or termination upon a substantial change of circumstances, including but not limited to, the defendant's receipt of social security income or pension benefits from any source.
 11. Automobiles: The plaintiff shall retain the Mitsubishi and the Dodge automobiles.
 12. Life Insurance: The plaintiff shall maintain the life insurance policy in the amount of $100,000 available through his employer naming the minor child and the defendant as beneficiaries until his obligation to pay child support and alimony ceases. The proceeds shall be allocated as follows: 75% to insure child support and 25% to insure alimony. The defendant shall maintain the $17,000 life insurance policy available through her employer naming the child as beneficiary until the child attains the age of 19 years or graduates from high school, whichever event first occurs.
 13. Attorney's Fees: The plaintiff shall pay the sum of $5000 toward the defendant's attorney's fees. The court finds that there is substantial disparity between the plaintiff's income and that of the defendant and that it is unlikely that the defendant's income will increase substantially in the future. Ordering her to pay all her attorney's fees would undermine the court's financial orders for her support. (Costa v. Costa, 57 Conn. App. 165).
 14. Arrearage: The plaintiff shall pay the unallocated alimony due through March if it has not been paid hitherto.
 15. Child Support: Absent agreement, the court orders that child support be secured by an immediate wage garnishment. In the event the parties agree upon a contingent wage garnishment, they shall file the appropriate pleading with the court.
All other claims for relief not expressly addressed herein have been rejected.
Judgment shall enter accordingly. CT Page 4570
SANDRA VILARDI LEHENY, J.